CLEMENTS AUTO COMPANY, d/b/a Southern Minnesota Supply Company, SM Supply Company, a Wisconsin Corporation, and SM Supply Company, a Minnesota Corporation, Appellees,

v.

The SERVICE BUREAU CORPORATION, Appellant.

No. 19783.

United States Court of Appeals, Eighth Circuit.

April 27, 1971.

Rehearing Denied May 27, 1971.

Nicholas deB. Katzenbach, Armonk, N. Y., Thomas R. Behan, Stuart W. Rider, Jr., Dayton E. Soby, Richard J. Nygaard, Michael Wolcott, Minneapolis, Minn., for appellant; Rider, Bennett, Egan, Johnson & Arundel, Minneapolis, Minn., of counsel.

Kelton Gage, Mankato, Minn., Blethen, Ogle, Gage & Krause, Mankato, Minn., for appellees.

Before MEHAFFY, HEANEY and BRIGHT, Circuit Judges.

HEANEY, Circuit Judge.

The Service Bureau Corporation, a wholly-owned subsidiary of International Business Machines Corporation, appeals from a judgment awarding SM Supply Company $480,811 in damages, the basis of the award being actionable misrepresentations made by SBC to SM in connection with the sale of data processing services.

SBC asks this Court to set aside the judgment. It contends: (1) that the trial court erred in finding that SBC had made actionable misrepresentations, and (2) that the trial court's award of damages was improper.

Diversity of citizenship is present and the amount in controversy exceeds $10,-000.

 We review the evidence only briefly because the trial court's opinion does so thoroughly. We accept all inferences which reasonably tend to support the conclusions of the trial court. Minnesota Amusement Company v. Larkin, 299 F.2d 142 (8th Cir. 1962).[1]

SBC is engaged in the business of electronic data processing, offering to the public its services in eighty-four branch offices throughout the United States. It sells data processing services in the following areas: payroll, personnel records, accounts receivable, billing, sales accounting, marketing studies, cost accounting, inventory record, budgets and general accounting.

SM operates wholesale supply houses at Mankato and Rochester, Minnesota, and at Eau Claire, Wisconsin. It operated a similar supply house in LaCrosse, Wisconsin, through 1965. It deals in automotive parts and supplies, electrical

---

1. Under Minnesota law, as much weight is given by an appellate court to the factual findings of a court as is given to those of a jury. Viking Automatic Sprinkler Co. v. Viking Fire Protect. Co., 280 Minn. 250, 159 N.W.2d 250 (1968). Under federal law, we give somewhat less weight to the factual findings of a trial court than we give to those of a jury. Our test is whether, in the light of all the evidence, we are convinced that a mistake has been made. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). Without deciding which test is the appropriate one in diversity cases, we have reviewed the findings in the light of the more stringent federal test and with the exceptions noted in the opinion find ourselves unconvinced that a mistake has been made. Where we have not accepted the trial court's findings, our conclusion would be the same had we applied the state standard. See, Hanson v. Ford Motor Company, 278 F.2d 586, 589-590 (8th Cir. 1960).

construction materials, and electronic parts, supplies and equipment. Each outlet stocks more than sixty thousand items, ranging in value from a few cents per item to hundreds of dollars per item and in quantities of from one to several thousands each. SM's volume of business exceeded $6,900,000 each year from 1962 through 1966.

The first business relationships between the plaintiff and the defendant developed in 1961. In that year, SBC agreed to furnish data processing service to a Chevrolet dealership affiliated with SM. The services proved satisfactory and led SM's president to discuss SM's inventory problems with SBC. SBC indicated that it did not, at that time, have the computer capacity to provide the required data processing services. In the summer of 1962, however, SBC informed SM that, early in 1963, it would be acquiring an IBM 1401 computer which would have the capacity to produce data processing service for SM.

SBC made a study of SM's operations during the summer of 1962, with the view of providing data processing services to SM. SBC conferred with SM frequently during the study period and subsequent thereto. In February, 1963, SM signed two contracts dated December 20, 1962, under which SBC agreed to provide certain basic data processing services to SM. The two contracts were "accepted" by SBC in New York on April 4, 1963. Twelve additional contracts providing for additional services were signed by the parties during the succeeding four years. Processing of cards to be used in the system was initiated at the Mankato outlet in September, 1963; at the Rochester outlet in late 1963; and in the Wisconsin stores in the spring of 1964.

The nature of the data processing services provided during the four-year relationship between SBC and SM may be conveniently categorized into three basic stages. Initially, SBC automated SM's accounting and billing. At the same time, SBC used this input material to prepare certain monthly sales analysis reports and a weekly report of inventory movement. The inventory reports contained a six-week history of sales for all of SM's inventory. In August of 1964, the weekly inventory report was changed to a bi-weekly report which provided twelve weeks of history.

Second generation inventory reports began in January, 1965, and continued through December 4, 1965. These were bi-weekly reports which provided a twelve-week movement history, a record of inventory purchases, receipts and inter-branch transfers, and, for the first time, an on-hand balance of items for certain vendors selected by SM.

Finally, in December, 1965, SM signed a contract to obtain a third generation of inventory reports. These reports were to contain a detailed history for each item for the previous year, a movement history during specified months, an on-hand figure, and a computation of the number of weeks' supply of each item on hand. These reports were to be delivered beginning in January, 1966, but were not received until July, 1966, due to the discovery of an earlier programming error by SBC.

The services proved to be unsatisfactory to SM. It charges that the input method was slow and expensive, and that the reports were too error-prone and voluminous to be of use in purchasing inventory. SM finally terminated all contracts with SBC in January, 1967.

SM then brought the present lawsuit against SBC in September of 1967. It proceeded on the theories of rescission, breach of implied warranty, breach of contract, reformation and fraudulent misrepresentation. SBC counterclaimed for payments due.

The action was tried to the court without a jury. The court filed a detailed memorandum opinion and order on March 31, 1969. Clements Auto Company v. Service Bureau Corporation, 298 F.Supp. 115 (D.Minn.1969). The court

denied recovery on all grounds other than misrepresentation, but found that SBC had made one central actionable misrepresentation to SM, *i. e.*, that the proposed data processing system would, when fully implemented, be capable of providing SM sufficient information in a form such that when properly utilized, it would constitute an effective and efficient tool to be used in inventory control.[2]

It further found that SBC had made several other specific actionable misrepresentations to SM:

(1) that the only way SM would ever get an inventory control system such as that in use at the Chevrolet dealership would be by automating the firm's accounting;

(2) that there were controls built into the system which were adequate to prevent any but a minimal number of errors;

(3) that Friden Flexowriters were a suitable input device to be used in the data processing system, that eight Flexowriters would be sufficient to do the job, that the Flexowriters could be operated by normal clerical personnel, and that the Flexowriters would produce a typed hard copy of the invoice which could be sent along with the customer's order; and

(4) that weekly sales management reports provided by the contract would allow management by exception.

It is conceded by the parties that the trial court properly relied on Hanson v. Ford Motor Company, 278 F. 2d 586 (8th Cir. 1960), in enumerating the essential elements of a fraud action in Minnesota:[3]

"1. There must be a representation;

"2. That representation must be false;

"3. It must have to do with a past or present fact;

"4. That fact must be material;

"5. It must be susceptible of knowledge;

"6. The representer must know it to be false, or in the alternative, must assert it as of his own knowledge without knowing whether it is true or false;

"7. The representer must intend to have the other person induced to act, or justified in acting upon it;

"8. That person must be so induced to act or so justified in acting;

"9. That person's action must be in reliance upon the representation;

"10. That person must suffer damage;

"11. That damage must be attributable to the misrepresentation, that is, the statement must be the proximate cause of the injury."

*Id.* at 591.[4]

2. The defendant stipulated prior to trial that its representatives advised the plaintiffs that it would provide data processing services for invoicing, weekly sales reports, monthly sales reports, monthly customer statements and accounts receivable trial balances at the outset, that these would immediately assist the plaintiffs in purchasing inventory and that SBC would eventually provide the plaintiffs with data processing for inventory control.

3. Each of the contracts provide that New York law controls. This choice of law provision is valid under Minnesota law. See, Combined Ins. Co. of Am. v. Bode, 247 Minn. 458, 77 N.W.2d 533 (1956).

However, Minnesota conflicts law would apply Minnesota law to the tort action of fraud. See, e. g., Lowrey v. Dingmann, 251 Minn. 124, 86 N.W.2d 499 (1957).

4. See also, Berryman v. Riegert, 286 Minn. 270, 175 N.W.2d 438 (1970); Weise v. Red Owl Stores, Inc., 286 Minn. 199, 175 N.W.2d 184 (1970) (adopting *Hanson's* statement of the elements of fraud); Davis v. Re-Trac Manufacturing Corporation, 276 Minn. 116, 149 N.W.2d 37 (1967) (adopting *Hanson's* statement of the elements of fraud); Hafner v. Ritzinger, 256 Minn. 196, 97 N.W.2d 839 (1959); L'Evesque v. Rognrud, 254 Minn. 55, 93 N.W.2d 672 (1958); Swan-

■ It is important ·to emphasize that, in Minnesota, the element of scienter, or intent to deceive, or even recklessness, is not necessary to actionable fraud. As the Minnesota Supreme Court stated in Swanson v. Domning, 251 Minn. 110, 86 N.W.2d 716, 720–721 (1957):

> "It is immaterial whether a statement made as of one's own knowledge is made innocently or knowingly. An intent to deceive no longer is necessary. Nor is it necessary to prove that defendants knew the representations were false.
>
> \* \* \* \* \*
>
> " \* \* \* It is not necessary that the statement be recklessly or carelessly made. It makes no difference how it is made if it is made as an affirmation of which defendant has knowledge and it is in fact untrue. The right of recovery in a case of this kind is based on the fact that such statement, being untrue in fact, relied upon by the other party in entering into the transaction, has resulted in the loss to him which he should not be required to bear." (Footnotes omitted.)

See also Berryman v. Riegert, 286 Minn. 270, 175 N.W.2d 438 (1970).

While accepting the above as a correct statement of Minnesota law, SBC raises two arguments in opposition to the trial court's finding of liability for fraud. It first argues that the trial court erred in applying the Minnesota law of fraud to the present situation. The argument is rooted in what SBC considers to be a legal inconsistency in the trial court's findings. It is developed by SBC as follows:

(1) The trial court found certain aforementioned representations made to SM to be actionable under the Minnesota law of fraud.

(2) The trial court found that these same representations did not give rise to an express warranty because there was no valid agreement by the parties incorporating these representations into the contract, and that a disclaimer in the various contracts effectively negated all implied warranties.

(3) Under the relevant law, innocent misrepresentations and warranties, either express or implied, are substantially similar in nature.

(4) The passage of the Uniform Commercial Code by the legislature evinced an intent to have that body of law control all commercial transactions.

The conclusion drawn is that:

> "In short, SBC does not believe that the law of innocent misrepresentations in Minnesota can or should be read as in conflict with commercial doctrine in that state, and believes it was error for the Trial Court to do so. The Trial Court treated the facts of this case as giving different results when viewed under Minnesota Tort Law than when viewed under Minnesota Contract Law. SBC does not believe the results can or should depend merely upon the label."

Appellant's Brief, p. 29.

· SBC candidly admits that this question has never been squarely faced by the Minnesota Supreme Court, but suggests that the governing policy of the U.C.C. compels its interpretation of the relationship between contract and tort law.

■ We cannot agree that this argument dictates a result other than that reached by the trial court. We start with the premise that the Erie Doctrine requires the application of Minnesota law. In the absence of explicit authority from the Minnesota Supreme Court, our obligation is " \* \* \* to determine what the Supreme Court of Minnesota would declare the Minnesota law to be were this case before it." Village of

son v. Domning, 251 Minn. 110, 86 N.W. 2d 716 (1957); Spiess v. Brandt, 230 Minn. 246, 41 N.W.2d 561, 27 A.L.R.2d 1 (1950); Osborn v. Will, 183 Minn. 205,

236 N.W. 197 (1931); Helvetia Copper Co. v. Hart-Parr Co., 137 Minn. 321, 163 N.W. 665 (1917); Schlechter v. Felton, 134 Minn. 143, 158 N.W. 813 (1916).

Brooten v. Cudahy Packing Company, 291 F.2d 284, 288 (8th Cir. 1961).[5]

The first argument raised by SBC necessarily rests on two assumptions, both of which must be valid to sustain SBC's position:

(1) That the trial court's ruling as to the warranties was a correct assessment of Minnesota law.

(2) That the Minnesota Supreme Court would not permit the same representations to result in liability for fraud, but not for breach of warranty.

Assuming, arguendo, that the trial court correctly found the warranty disclaimer valid,[6] we nevertheless believe that the Minnesota Supreme Court would find liability for fraud. SBC's conclusion that liability for innocent misrepresentation cannot exist without liability for breach of warranty compels two further conclusions:

(1) A contract provision which validly negates warranties is sufficient to negate liability for innocent misrepresentations.

(2) The Minnesota Supreme Court would be willing to distinguish between innocent and intentional misrepresentations.[7] Both of these conclusions appear to be contrary to the main thrust of Minnesota law.

In Ganley Bros., Inc. v. Butler Bros. Building Co., 170 Minn. 373, 212 N.W. 602 (1927), two contractors had entered into an agreement involving subletting highway construction work. The subcontractor subsequently sued the prime contractor for damages alleging, inter alia, that the contract in question was induced by false and fraudulent misrepresentations. By way of defense, the prime contractor introduced a provision in the contract which stated:

"The contractor has examined the said contracts of December 7, 1922, and the specifications and plans forming a part thereof, and is familiar with the location of said work and the conditions under which the same must be performed, and knows all the requirements, and is not relying upon any statement made by the company in respect thereto."

*Id.* at 212 N.W. 602.

The trial court dismissed the fraud action on the grounds that this provision validly negated fraud. On appeal, the Supreme Court of Minnesota reversed, holding that:

"The law should not, and does not, permit a covenant of immunity to be drawn that will protect a person against his own fraud. Such is not enforceable because of public policy."

*Id.* at 212 N.W. 603.

In arriving at this decision, the court specifically considered the extent of freedom of contract and concluded that it did not extend to waiver of fraud either directly or indirectly.

SBC concedes that the teachings of *Ganley Bros.* are applicable where the fraud action is based on intentional conduct, but contends the rule must be different where innocent misrepresentations are the basis of the fraud action. In support of this reading, it refers us to the court's statement that:

"Language is not strong enough to write such a contract. Fraud destroys all consent. *It is the purpose of the*

---

5. For a helpful article in the area of federal interpretation of state law, see Note, 53 Minn.L.Rev. 806 (1969).

6. Minnesota decisions have generally given a very narrow interpretation to warranty disclaimer provisions in contracts. See generally, Dougall v. Brown Bay Boat Works and Sales, Inc., 287 Minn. 290, 178 N.W.2d 217 (1970); Beck v. Spindler, 256 Minn. 543, 99 N.W.2d 670 (1959); McPeak v. Boker, 236 Minn. 420, 53 N.W.2d 130 (1952); Bekkevold v. Potts, 173 Minn. 87, 216 N.W. 790 (1927); Note, 23 Minn.L.Rev. 784 (1939).

7. SBC concedes that a merger and disclaimer provision does not preclude liability for intentional fraud.

*law to shield only those whose armor embraces good faith."* (Emphasis added.)

*Id.* at 202 N.W. 603.

A close reading of *Ganley Bros.* leaves us uncertain whether the fraud considered in that case included an element of bad intent. In any event, we do not believe that this gratuitous language sets out the controlling factor in determining the effect of an exculpatory contract provision on an action in fraud. In the case of National Equipment Corporation v. Volden, 190 Minn. 596, 252 N.W. 444 (1934), the Minnesota Court dealt with a fraud action based on misrepresentations in the sale of a "dumptor," a piece of construction equipment used in earth moving operations. The court first cited Ganley Bros., Inc. v. Butler Bros. Building Co., *supra,* for the proposition that parole evidence was properly introduced to prove that the contract had been procured by fraudulent representations. It then went on to find that fraud had been committed and, in so doing, relied on its earlier opinion in Helvetia Copper Co. v. Hart-Parr Co., 137 Minn. 321, 163 N.W. 665 (1917), for its definition of fraud. In *Helvetia Copper,* the court had specifically held that an action in fraud required no showing of scienter:

"The damage to plaintiff, arising from the fact that * * * [the representations were false] * * * is the same whether the representations * * * were known to be false by defendant, and made with intent to deceive, or whether they were made innocently and in perfect good faith. The good faith of defendant is no defense.

* * * * * *

"Defendant was the manufacturer of the engine, and presumptively possessed of knowledge of its condition and whether the improvements suggested would overcome the defects theretofore complained of. The representations were unqualified and must be treated as assertions of a fact within the knowledge of defendant, *the falsity of which constitutes fraud as a matter of law."* (Emphasis added.)

*Id.* at 163 N.W. 667.

The court in *National Equipment* then faced the issue pertinent here. The sales contract contained a provision that:

" * * * no representations made by an agent not included herein shall be binding * * *."

The court followed *Ganley Bros.* in finding the contract provision ineffective to negative the fraud action:

"A party who makes fraudulent representations to induce another to make a contract cannot escape liability for his fraud by incorporating a disclaimer of fraud in the contract."

*Id.* at 252 N.W. 445.

██ Considering the court's definition of fraud and the fact that we can find no indication in the opinion that deceitful intent was in fact demonstrated, we believe this decision must be read as holding that a general disclaimer clause is ineffective to negate reliance on even innocent misrepresentations. This view is further supported by Goldfine v. Johnson, 208 Minn. 449, 294 N.W. 459 (1940), wherein the court relied on the decision in *National Equipment* in ruling that the question of reliance was for the jury. The dispute involved the sale of a tractor and the court made the following observations:

"The contract was that defendant should take the tractor 'as it is.' Thereby, the question of warranty is ruled out. Defendant places sole reliance upon his allegation of fraud.

*"If the representations in question were false,* as they have been found to be by the jury, *they were fraudulent."* (Emphasis added.)

*Id.* at 294 N.W. 460.

There is no indication that the disclaimer of warranty negates reliance on

false representations made with or without intent to deceive.[8]

The only situation in which the Minnesota courts have held that a contract provision negatives a claim of fraud is where the provision explicitly states a fact completely antithetical to the claimed misrepresentations. For example, in Vint v. Nelson, 267 Minn. 490, 127 N.W.2d 177 (1964), the plaintiff sued pursuant to signed contract for a real estate broker's commission. The defendants cross-claimed for reformation of the contract alleging that they had been induced to sign the contract by false and fraudulent representations that the contract was cancellable on thirty days' notice. The plaintiff denied making the alleged statements and the contract itself provided in part:

> " * * * said exclusive agency to remain in effect for the period of Six months from the date hereof and and thereafter until revoked by thirty days notice in writing. * * * "

*Id.* at 127 N.W.2d 178.

In this case, the court held that the parole evidence exception of National Equipment Corp. v. Volden, *supra,* and Ganley Bros., Inc. v. Butler Bros. Building Co., *supra,* was inapplicable where:

> " * * * the testimony offered to establish fraud related to matters known to be covered by the written agreement and to the claim that plaintiff had represented that contractual provisions having reference thereto would not be effective."

Vint v. Nelson, *supra* at 127 N.W.2d 181. See generally, City of St. Paul v. Dahlby, 266 Minn. 304, 123 N.W.2d 586 (1963); Skelton v. Grimm, 156 Minn. 419, 195 N.W. 139 (1923). But see, Weise v. Red Owl Stores, Inc., 286 Minn. 199, 175 N.W.2d 184 (1970).

The representations complained of here do not relate to or contradict any specific substantive contract provision as in Vint v. Nelson, *supra.* The provision SBC seeks to invoke is merely a general integration and disclaimer clause which falls within the rule established in National Equipment Co. v. Volden, *supra.*

It is also worthwhile to note that a student article in the 1939 Minnesota Law Review would apparently agree with our conclusion as to the effect of a general disclaimer clause. Note, 23 Minn.L. Rev. 784 (1939). The article, entitled "Contractual Disclaimers of Warranties," is primarily concerned with various methods used by courts to nullify the effect of contract disclaimer provisions. After considering the orthodox approaches then used by courts, especially the Minnesota Supreme Court, in contract cases, the author suggests.

> "There is one other possible solution for the problem. If the buyer were to bring a suit in tort for deceit instead of in contract for breach of warranty, the action should not be defeated by a provision waiving warranties. Although in a majority of the American courts the purchaser undoubtedly would not be able to prevail if he could not prove scienter, a few states headed by Minnesota, do not make that requirement."

*Id.* at 798.

While the author concedes that this approach would not generally be effective where no affirmative representations had been made, it is undisputed that the present action is based on affirmative oral and written statements.

SBC's argument that the passage of the Uniform Commercial Code would lead the Minnesota Court to a contrary result is unpersuasive. The U.C.C. did not

8. See also, Wisconsin Mystic Iceless Refrigerator, Inc. v. Minnesota Mystic Iceless Refrigerator, Inc., 180 Minn. 334, 230 N.W. 796 (1930); Roseberry v. Hart-Parr Co., 145 Minn. 142, 176 N.W. 175 (1920); Edward Thompson Co. v. Schroeder, 131 Minn. 125, 154 N.W. 792 (1915); 54 Minn.L.Rev. 846, 850 (1970); cf., Martin v. Guarantee Reserve Life Insurance Co., 279 Minn. 129, 155 N.W. 2d 744 (1968).

become effective in Minnesota until July 1, 1966. Minn.Stat. § 336.10–105 (1966). Since the contracts in question were signed and primarily performed prior to that date, it is highly likely that the Minnesota Supreme Court would decide this case on the basis of the preexisting law. See, Dougall v. Brown Bay Boat Works and Sales, Inc., 287 Minn. 290, 178 N.W.2d 217 (1970).

Secondly, and more importantly, we do not believe that there are any indications that the passage of the U.C.C. would, in fact, alter the Minnesota law of fraud. The Uniform Commercial Code itself provides that:

"Unless displaced by the particular provisions of this chapter, the principles of law and equity, including the law merchant and the law relative to * * * fraud, misrepresentation * * * or other validating or invalidating cause shall supplement its provisions."

Minn.Stat. § 336.1–103 (1966). See also, Minn.Stat. § 336.1–721 (1966). Cf., Thorton Bros. v. Reese, 188 Minn. 5, 246 N.W. 527 (1933).

Further, the Uniform Commercial Code was, in part, a replacement for the Uniform Sales Act which had been the basis of existing commercial law in Minnesota since 1917. Laws 1917, Chapter 465 (Minn.). A governing policy of national uniformity in commercial transactions was a motivating influence in the passage of both of these uniform acts. Moreover, the passage of the U.C.C. did not substantially alter Minnesota law as to disclaimer of warranties.[9] These factors tend to undercut SBC's contention that the passage of the U.C.C. would alter the relationship in Minnesota between the law of fraud and the law of warranty. Similarly, the fact that the U.C.C. has not brought a radical change to Minnesota contract law would give added authority to the earlier decisions of the Minnesota Court.

In viewing these earlier decisions, we believe it is relevant that the Minnesota Court has stated that:

"The fact that one who has been defrauded has a remedy on the contract or on a guaranty or warranty is not any impediment or defense to an action for the fraud or deceit. * * * "

Osborn v. Will, 183 Minn. 205, 236 N.W. 197, 200 (1931). See also, Hedin v. Minneapolis Medical & Surgical Inst., 62 Minn. 146, 64 N.W. 158 (1895).

On other occasions, the Minnesota Court has reiterated the differences in the law governing breach of warranty and the law governing fraud. E. g., Hemming v. Ald, Inc., 279 Minn. 38, 155 N.W.2d 384, 386–387, n. 2 (1967) (time period in which rescission allowed); Lehman v. Hansord Pontiac Co., 246 Minn. 1, 74 N.W.2d 305, 311 (1955) (measure of damages). It has never indicated that these distinctions do not obtain where the subject matter is governed by the U.S.A. or the U.C.C. In National Equipment Corporation v. Volden, supra, the court was faced with a fraud action. Two other decisions, including one by the Minnesota Court following Wisconsin law, had recently awarded purchasers relief for breach of warranty in situations substantially similar to that facing the court. See, National Equipment Corporation v. Moore, 189 Minn. 632, 250 N.W. 677 (1933); Hughes v. National Equipment Corporation, 216 Iowa 1000, 250 N.W. 154 (1933). The Minnesota Court in Volden, however, refused to place any reliance on these cases since they were contract actions rather than fraud actions.

Finally, in attempting to predict what the Minnesota Supreme Court would decide were this case before it, we are influenced by the persistent and consistent efforts of that court in providing easy access to an action for fraud. Beginning at least with Schlechter v. Felton, 134 Minn. 143, 158 N.W. 813 (1916), the Minnesota Reports are replete with

---

9. See, Minnesota Code Comment accompanying M.S.A. § 336.2–316 (1966) and materials cited therein.

decisions which uphold the action for fraud which SBC now asks us to limit. In its two most recent decisions concerning fraud actions, the court reaffirmed the broad remedial features of the Minnesota law of fraud. Berryman v. Riegert, *supra*; Weise v. Red Owl Stores, Inc., *supra*. In our view, we would distort the established body of Minnesota law were we to hold that under the U.C.C., an action for fraud, based on innocent misrepresentation, could not be maintained where the contract validly disclaimed all warranties. The Minnesota Supreme Court is free to make its own decision. All we decide is that, on the basis of the factors we can find, it would decide as we have.

SBC argues alternatively that even if the trial court was correct in applying the Minnesota law of fraud to this situation, it erred in finding that the representations proven by SM met the requirements for actionable fraud. Specifically, SBC contends that the representations found actionable by the trial court cannot be considered "past or present facts susceptible of knowledge" or that they were such that SM "was induced or justified in acting upon" them. See, text accompanying n.4, *supra*.

We believe that the trial court was correct in finding that the representations as a whole were more than mere predictions and that SM relied upon them in entering into the contract.

■ We have previously stated the central representation to be "that the proposed data processing system would, when fully implemented, be capable of providing SM sufficient information in a form such that when properly utilized, it would constitute an effective and efficient tool to be used in inventory control." While this statement is in a sense a prediction of what the system will do, it is also, under existing Minnesota law, a statement of the inherent capabilities of a particular product.

■ Minnesota decisions have traditionally held manufacturers to a high standard with respect to statements about their products. In National Equipment Corporation v. Volden, *supra*, the manufacturer's representative went to the purchaser's construction site, observed his operations and then stated that the equipment in question "would keep up with and surpass any other machine then being used by the [purchaser] and that it would work in cooperation with [the] other machines and equipment." The court found that such a statement would support a fraud action, stating:

"This was more than mere sales or trade talk. It was vital to defendants' operations that their machinery should work in harmony and that one piece should not impair the effectiveness of another. Plaintiff was possessed of knowledge of the machine and its capabilities, and its false assertion * * * that the [machine] would do a certain amount of work and coordinate with the machines already owned by defendants, was an assertion of fact and constituted fraud."

*Id.* at 252 N.W. 445.

Similarly, in Wisconsin Mystic Iceless Refrigerator, Inc. v. Minnesota Mystic Iceless Refrigerator, Inc., 180 Minn. 334, 230 N.W. 796 (1930), the court found liability for statements that a refrigerator would preserve foods in the warmest weather, and in Helvetia Copper Co. v. Hart-Parr Co., *supra*, liability was predicated upon statements to the effect that suggested repairs would overcome certain defects. See also, Schmitt v. Ornes Esswein & Co., 149 Minn. 370, 183 N.W. 840 (1921).

SBC relies to a great extent on our decision in First Acceptance Corp. v. Kennedy, 8 Cir., 194 F.2d 819 (1952), wherein we held that, under Iowa law, statements to the effect that an air conditioning system "would do the job" were statements of opinion rather than fact.

In our view, *First Acceptance* is factually distinguishable. In *First Acceptance,* the party bringing the fraud action had designed a completely novel method of storing onions. He realized that his

new system was somewhat of a "revolutionary experiment" and that his present air conditioning would be inadequate to preserve onions if he implemented the new storage system. He thereafter came into contact with an employee of an air conditioning company. Together they studied the problem carefully, and ultimately an air conditioning system was designed and installed by the air conditioning company. The system was unsuccessful. A large number of onions deteriorated and a large financial loss was incurred.

In finding that representations that the air conditioning system "would do the job" were predictions only, the Court relied heavily upon the fact that both parties knew that the storage system and the air conditioning system were completely new and experimental concepts. The onion grocer recognized the problems he faced and had enlisted the aid of the air conditioning expert. However, in the circumstances of the case, it was unreasonable to expect either party to be completely assured of the success of the venture. As a practical matter, the Court noted that the ultimate design was a product of the knowledge of both parties and there was no proof whether the system failed because of inherent problems in the air conditioning design or because of problems with the new storage method.

In a less extraordinary situation, the Minnesota Supreme Court has indicated that the statement that "an ice machine, * * * when installed, could and would keep the buyer's ice box at a temperature low enough to prevent meat from spoiling" was a statement of an existing fact —the inherent capacity or power of the machine. Schmitt v. Ornes Esswein & Co., *supra*.

While the representation in question here would appear to fall somewhere between these two cases, we think that there was sufficient evidence from which the trial court could determine that the statement was one of fact rather than opinion and could reasonably have been relied upon as such. SBC was clearly an expert in the data processing area and was known to have extensive experience in the area of inventory control. There is nothing in the record to indicate that SM presented or thought it presented any special problems in regard to designing data processing services for inventory control. SM sought inventory control and was told by the expert in the field that the system designed would provide it.

Further, the fact that there were a number of specific representations made which were ancillary to and supportive of the main representation supports our view that, taken as a whole, the statements were factual rather than mere predictions. SBC was found to have made representations concerning the error-control features of the system it designed, the suitability and capabilities of the Friden Flexowriters, the input device it suggested and the usefulness of the weekly sales reports as a tool for management by exception. Each of these representations were statements of existing fact dealing with the inherent capabilities of the system designed by SBC. To a large extent, the accuracy of these more fundamental statements was essential to the validity of SBC's representation that its system would be a useful tool for inventory control.

In Hollerman v. F. H. Peavey & Company, 269 Minn. 221, 130 N.W.2d 534 (1964), a vendor of poultry feed was held liable for misrepresenting future profits. Specifically, the court found that the vendor's assurance that disease was a minor problem and need not give the producers any concern was a material misrepresentation of fact.

Here, while the issue was controverted, there was sufficient expert evidence from which the trial court could find that these ancillary representations were not true. SBC argues that the difficulties occurred not because these representations were inherently inaccurate, but rather because they were based on false assumptions of volume made by SM. For example, it appears from the record that SBC's proposal was based on estimations

of 45,000 parts and 6,000 customers per outlet when, in fact, substantially more parts and customers were involved. The record is also clear that these discrepancies caused some of the specific representations to be false and had some effect on the overall system. We agree with SBC that they cannot be held responsible for problems created by SM's lack of knowledge of its own operations. SBC's two-week study of SM's operation could not reasonably have given them this kind of detailed knowledge, nor could SM expect that it did.

Thus, the fact that eight Flexowriters were insufficient to keep up with the volume of input and that a hard copy of the invoices was not produced in time to be sent along with the customer's order cannot properly be attributed to SBC. More importantly, however, there was sufficient testimony in this record to support a finding that the SBC-designed system had inadequate error-control features, that the Flexowriters were not a suitable input device for SM's needs, and that it was difficult for normal clerical personnel to operate the Flexowriters. These errors of fact, as found by the trial court, are solely within SBC's field of expertise in data processing. Furthermore, there was testimony which directly linked these misrepresentations to the ultimate failure of the system to provide SM with satisfactory inventory control reports.

Finally, the trial court found that SM was told that the only way it would ever obtain an inventory control system such as that in use at the Chevrolet dealership would be by automating the firm's accounting. This is clearly a statement of fact. SBC does not contend otherwise. It is also conceded by SBC to be false. SBC responds by contending that the statement was not made and that it is so patently unbelievable that no reasonable reliance could be placed on it. However, there is evidence in the record which supports the trial court's finding to the contrary on both of these issues. There is also considerable evidence that the problems encountered by the system occurred, at least in part, because of the monumental effort involved in automating SM's accounting.

SBC next argues that there was no actual or justifiable reliance by SM on any representations made by SBC. We think this contention is without merit when applied to the initial relationship between SM and SBC.

We first note that we have previously discussed and disposed of SBC's contention that the merger and disclaimer provisions of the contracts negate reliance on the representations.

Secondly, we take notice of the inequality of knowledge as between the two parties. SBC was clearly the expert in the computer field and must be held responsible for superior knowledge in that field. The Minnesota Court has frequently looked to the relative knowledge of the parties in determining whether reliance on the representations was justified. In Hollerman v. F. H. Peavey & Company, *supra,* the court considered a business transaction between a major feed dealer and a farmer. The court found that:

"Here the parties were not 'on an equality.' Plaintiffs had superior knowledge, or an opportunity for knowledge, of the problems which might be encountered in the conduct of the business. Because of their ignorance and inexperience in regard to matters concerning which material representations were made, plaintiffs had a right to rely upon the superior knowledge of defendants."

*Id.* at 130 N.W.2d 540. See also, Berryman v. Riegert, *supra;* Kennedy v. Flo-Tronics, Inc., 274 Minn. 327, 143 N.W.2d 827 (1966); Gaertner v. Rees, 259 Minn. 299, 107 N.W.2d 365 (1961); Strand v. Librascope, Inc., 197 F.Supp. 743 (E.D. Mich.1961). Here, it is clear that, in entering into their initial agreements, SM relied upon the representations made by SBC regarding the usefulness and accuracy of the various reports. We agree with the trial court that SM had no basis for relying on representations such as

that six weeks of inventory history would be sufficient. Such a statement was more peculiarly within SM's own business expertise. However, SBC's statements regarding the overall usefulness of its system, the presence of error-control features, the properties of the Flexowriters and the necessity of automating SM's accounting were all statements upon which SM, with its limited knowledge of computers and data processing systems, could reasonably rely, given the superior knowledge of SBC.

■■■ It is also clear that SM did rely on these statements in entering into the SBC contracts. SM wanted inventory control, and the record is clear that SM's management relied to some extent on the overall representations of SBC in deciding that SBC's proposal would provide it.

■■■ Nor can we agree with SBC's contention that the evidence concerning SM's investigation of the Flexowriters indicates as a matter of law that there was no reliance on SBC's representations. In a similar situation, the Minnesota Court has said:

> "But where, as here, a party to whom a representation has been made has not made an investigation adequate to disclose the falsity of the representation, the party whose misstatements have induced the act cannot escape liability by claiming that the other party ought not to have trusted him."

Davis v. Re-Trac Manufacturing Corporation, 276 Minn. 116, 149 N.W.2d 37, 39 (1967). See also, Berryman v. Riegert, *supra*; City of Coon Rapids v. Suburban Engineering, Inc., 283 Minn. 151, 167 N.W.2d 493 (1969); Greear v. Paust, 192 Minn. 287, 256 N.W. 190 (1934). The evidence of the investigation may well have raised an issue of fact, but on the record before us, we cannot say that the trial court's determination was erroneous. See, Goldfine v. Johnson, *supra*.

Lastly, SBC contends that even if SM was initially justified in their reliance on SBC's representations, SM discovered the falsity of the statements long before the relationship was terminated in January, 1967. The trial court found that while SM may have been aware of the problems with the system by the end of 1964, no duty to mitigate damages by terminating the contracts arose before September of 1966. It so held on the theory that SM was not aware of the exact cause of the problems and was so financially committed to the system that it was unreasonable for it to sever its contracts with SBC before that date.

Having carefully reviewed the applicable law and the lengthy record in this case, we conclude that the trial court erred in this finding.

■■■ The general rule in Minnesota is that " * * * a party defrauded cannot, after discovery of the fraud, increase his damages by continuing to expend money on the property retained and recover for such expenditures * * *." Perkins v. Meyerton, 190 Minn. 542, 251 N.W. 559, 560 (1934). As stated in L'Evesque v. Rognrud, 254 Minn. 55, 93 N.W.2d 672, 677 (1958):

> " * * * [T]he measure of damages is the difference between the actual value of the property received and the price paid for it, and in addition thereto such other or special damages as were naturally and proximately caused by the fraud *prior to its discovery*." (Emphasis added.)

See also, Lowrey v. Dingmann, 251 Minn. 124, 86 N.W.2d 499 (1957); Barthelemy v. Foley Elev. Co., 141 Minn. 423, 170 N.W. 513 (1919). Following these principles, it is clear that a party to an executory contract, who prior to its performance discovers fraud, may not go forward with performance of the contract and subsequently sue for damages. Defiel v. Rosenberg, 144 Minn. 166, 174 N.W. 838 (1919); Thompson v. Libby, 36 Minn. 287, 31 N.W. 52 (1886). The exception to the above principle is that where the defrauded party discovers the fraud after substantial performance or where it would be economically unreasonable to terminate the relationship, he may affirm or continue the contract and then bring suit for his entire damages.

Kennedy v. Flo-Tronics, Inc., *supra*; Rosenquist v. Baker, 227 Minn. 217, 35 N.W.2d 346 (1948); Forsberg v. Baker, 211 Minn. 59, 300 N.W. 371 (1941); Perkins v. Meyerton, *supra*.

In attempting to apply these legal principles, we must recognize two basic facts:

(1) The relationship involved here was based on a number of different contracts which were entered into over a period of approximately four years. Each of the basic contracts provided for continuing services and was terminable by either party upon thirty days' notice.

(2) The essential problems with the reports were apparent soon after they were provided to SM during 1963. While each of the three phases of the reports was progressively more sophisticated, the basic bulk and error-proneness of all the reports problems from the start.

Having considered the problem in light of the legal principles and factual relationship set out above, we conclude that as of April 30, 1965, SM was fully aware of the problems in the system and no longer had a basis for relying on the representations made by SBC.

In arriving at this conclusion, we realize that the record could reasonably support a finding of fact by the trial court that reliance ended at an even earlier date.[10] However, on review, we are limited in our decision and, therefore, have arrived at the April 30 date as the date after which no reliance can be sustained on this record as a matter of law.

The Mankato outlet began implementing the system in September, 1963, but the entire company was not automated until April, 1964. The first reports, which were received throughout 1964, showed only a six weeks' movement history and contained no on-hand figures. While these factors caused some problems in utilizing the reports, SM knew that they had contracted for exactly that type of report. However, it also became apparent to SM that the sales reports were extremely bulky and error-prone, making them even more difficult to use.

The record indicates that SM and SBC were both aware of the problems involved and worked together to try to get some of the mechanical difficulties out of the system. Despite their efforts, the problems continued. SM had difficulty getting its buyers to use the reports. In the latter part of 1964, the movement history was lengthened from six to twelve weeks in order to obtain more reliable data. Shortly thereafter, the parties entered into an agreement which provided for the second generation inventory reports. These reports incorporated a large number of on-hand figures and also accounted for inventory purchases, receipts and inter-branch transfers. These reports were to begin in January of 1965.

At this point, we believe there is still support in the record for a finding that SM's actions resulted from SBC's representations. Even though the problems were visible, the system was new to SM and its employees. With some progress having been made in obtaining reliable input, and with the prospect of a longer history and more sophisticated report, SM may well have been justified in continuing the program. See, *e. g.*, Davis v. Re-Trac Manufacturing Corporation, *supra*.

However, when the second generation reports were received, beginning in January, 1965, SM clearly became aware of the debilitating nature of the problems in the system. The reports were still error-prone and difficult to use. Since the history was for a twelve-week period, we find that SM was justified in continuing with the system through March 31, 1965. At that point, reliance was no longer justified, and SM had the choice of terminating the contracts pursuant to the notice provisions or of assuming responsibility for further damages. Since the contract provided

---

10. For instance, SBC apparently argued before the trial court that SM was fully aware of the misrepresentations by the end of 1964.

for thirty days' notice before cancellation, we find the cutoff date to be April 30, 1965.

■ At this point, we do not believe continued reliance can be justified by economic compulsion or by the fact that SM may not have fully realized the technical cause of the system's flaws. SM's contracts with SBC were for services and were terminable on a month's notice. While SM had paid substantial sums to SBC at this point, these payments had not resulted in any equity which might be lost by termination. See, e. g., Rosenquist v. Baker, supra; Haven v. Neal, 43 Minn. 315, 45 N.W. 612 (1890). Continuation of the contracts meant a continuation of the same monthly payments. On two occasions, the Minnesota Supreme Court has held that a party who discovers that he has been induced by fraud to enter into a 99-year lease shortly after the lease has begun to run cannot recover damages for the entire term of the contract. The court has so held on the basis that, in such a situation, the unperformed portion of the contract must be treated as a severable executory contract. O'Neil v. Davidson, 147 Minn. 240, 180 N.W. 102 (1920); Defiel v. Rosenberg, supra. Here, it is even more apparent that the doctrine of substantial performance is inapplicable. SM's efforts and expense did justify some attempt to salvage the SBC system. However, we have already taken that factor into account in our conclusion. As Judge Blackmun stated in Hanson v. Ford Motor Company, supra, 278 F.2d at 598, " * * * the representer is not a guarantor."

Nor can SM's continued reliance be justified by the fact that they were not necessarily aware of the technical cause of their problems. While this factor would have some initial importance in permitting SM an opportunity to correct the system's faults, we believe that by March 31, 1965, it had unsuccessfully explored sufficient corrective measures to be no longer justfied in relying on SBC's original representations.

In arriving at this conclusion, we have also recognized that all of the representations complained of occurred prior to the signing of the initial contracts in December, 1962. SM makes no claim that its subsequent conduct was induced by continued fraudulent misrepresentations. As a matter of fact, the record clearly indicates that at least one of SB C's employees cautioned SM, in late 1964, against further expansion of the system.

■ We, therefore, conclude that SBC is liable in fraud for the representations it made to SM. However, we further find that this liability ended on April 30, 1965, and that SM may not recover for contracts entered after that date or for payments made after that date under existing contracts.[11] We recognize that this finding imposes a burden on SBC, but we believe that it is one that would be imposed by the Minnesota Court. Justice Hallam, speaking for that court fifty years ago, stated:

"The rule [of liability without scienter] seems to us consonant with practical justice. It does the defendant no injustice. If his information is not absolute, neither should his statement be. He can always protect himself by stating what is true—that is, that he has only a belief, or by stating the source of his information."

Schlechter v. Felton, supra at 158 N.W. 815.[12]

We now turn to the issue of

---

11. However, we do not believe, and SBC does not argue, that SM's actions constituted a waiver of fraud for damages incurred to this point. See generally, Perkins v. Meyerton, 190 Minn. 542, 251 N. W. 559 (1934); Defiel v. Rosenberg, 144 Minn. 166, 174 N.W. 838 (1919). See also, Swanson v. Domning, supra.

12. Moreover, the Minnesota Court has protected from liability for misrepresentation those who have properly qualified their representations. See, e. g., Gaertner v. Rees, 259 Minn. 299, 107 N.W.2d 365 (1961), Saupe v. St. Paul Trust Co., 170 Minn. 366, 212 N.W. 892 (1927).

## DAMAGES

The trial court awarded the following damages to SM:

(1) The sum *paid* by SM to SBC for data processing services from December, 1962, through January, 1967 ...................................... $192,551.65

(2) The expenses incurred by SM in leasing the Flexowriters through January 31, 1967, plus the expense incurred in maintaining them, less their salvage value as of January 31, 1967 ($4,500) ................................... $102,198.11

(3) The increased cost of clerical personnel to SM in the years 1963 through 1965 $ 24,135.43

(4) The increased cost of office supplies to SM in the years 1963 through 1966 $ 37,921.60

(5) A portion of the salaries paid by SM to its executives for the supervision of the data processing system in the years 1963 through 1966 .............. $ 50,500.00

(6) Excess inventory purchased in 1966 and still on hand at the date of trial .... $ 68,094.00

(7) Interest on Items (1) through (5) ................................... $ 74,241.71

TOTAL ....................... $549,642.50

*Less, Benefits Received by SM:*

Original Contracts ............................ $15,000.00
(Unpaid) ............................... $ 1,700.00

$16,700.00

Second and Third Generation Reports ............. $18,698.98
(Unpaid) ............................... $ 5,140.31

$23,839.29

Interest on Counterclaim Award ................. $ 867.88
Year-end Inventory Contracts .................... $14,799.00
Executive Salaries ............................ $12,625.00

TOTAL ....................... $ 68,831.17

NET RECOVERY ............... $480,811.33

We have previously accepted SBC's contention that the representations it made to SM could not have been relied upon throughout the life of the contracts between the parties. We have fixed the outer limits of reliance as of March 31, 1965, and have indicated that SM should be given an additional thirty days thereafter to terminate its contracts with SBC.

It follows that SM's award must be reduced to reflect the fact that it is not entitled to recover for payments to SBC for services rendered after April 30, 1965, or for the increased cost of clerical personnel, supplies or executive salaries after that date. Furthermore, the award must be reduced to reflect any savings SM might have effected had it been able to cancel its lease agreement with the Transport Leasing Company as of March 31, 1965; any saving that it might have effected by cancelling its maintenance agreement as of the same date; and any increase in the salvage value of the Flexowriters in excess of $8,500 [13] by virtue of being able to cancel at an earlier date. Finally, the award must be reduced to reflect the interest allowed on those payments or costs which we have disallowed.

Our computations indicate that these changes will reduce the award by approximately $153,000, depending on whether SM had a right to cancel its lease agreement with Transport Leasing on March 31, 1965, and a right to terminate its maintenance agreement with Friden on the same date. SBC contends, however, that the award should be reduced further. It urges (1) that because of contract provisions, the total award cannot exceed the total charges for services, and that no special or consequential damages can be awarded; (2) that no award can be made for interest prior to the decision; and (3) that no award is

13. It is conceded on appeal that the salvage value of the Flexowriters as of January 31, 1967, was $8,500 rather than the $4,500 found by the court.

justified for the excess inventory purchased in 1966 and still on hand at the date of trial. We consider these contentions seriatim.

## CONTRACTUAL LIMITATION OF LIABILITY

The contracts between SBC and SM contained the following provision:

" * * * SBC's liability with respect to this agreement is limited to the total charge for the services provided herein and no special or consequential damages may be recovered." [14]

SBC argues that this provision validly limits the damages which can be awarded here. Such contract provisions appear to be valid under New York law. Farris Engineering Corp v. Service Bureau Corp., 406 F.2d 519 (3rd Cir. 1969). There is also authority for the proposition that contract provisions may operate to limit liability in suits brought for breach of contract under Minnesota law. See, e. g., Independent Consol. Sch. Dist. No. 24, etc. v. Carlstrom, 277 Minn. 117, 151 N.W.2d 784 (1967); DeWitt v. Itasca-Mantrap Co-op Electrical Ass'n, 215 Minn. 551, 10 N.W.2d 715 (1943); Helvetia Copper Co. v. Hart-Parr Co., 142 Minn. 74, 171 N.W. 272 (1919); cf. Minn.Stat. § 336.2–719 (1966).

However, in our view, these cases do not resolve the issue we face here.[15] We think the issue is properly posed as follows: Where a cause of action for fraud has been established, would Minnesota law give effect to a contract provision limiting liability in awarding damages proven to result from the fraud? We believe that Minnesota law controls because in the final analysis the issue is controlled by the law of fraud.

In many ways, this question is substantially similar to SBC's earlier contention that a merger and warranty provision is effective to negate fraud. As it did there, SBC concedes that the contract provision is ineffective against intentional deceit, but argues it must be given effect where the fraud is based on "innocent misrepresentations." SBC again emphasizes the anomaly of obtaining different results in contract actions as opposed to fraud actions which do not include an element of bad faith.

However, we remain unconvinced that this difference in result would lead the Minnesota Court to give effect to the contract provision. In reaching this decision, we have relied to a large extent on our earlier analysis of the Minnesota law of fraud vis-a-vis Minnesota contract law. Minnesota's strong policy of providing an effective remedy in fraud would be substantially undermined were we to give effect to this severe restriction on the amount of liability. Having previously held that Minnesota would not give effect to a contract provision which would negate the fact of liability, we believe it inconsistent to hold that the court would then give effect to a provision limiting the amount of liability.[16]

14. This exact language was used in the first two contracts. Subsequent contracts had slightly different wording, but the same general meaning.

15. We are assuming, without deciding, the validity of this particular contract provision. If it were invalid, we would need to go no further. We have found no Minnesota case which has decided the validity of the precise provision in question here, either under the Uniform Commercial Code's unconscionability provision or under preexisting law.

16. A recent case comment has reached the opposite conclusion. 54 Minn.L.Rev. 846 (1970). The article, however, is primarily a theoretical discussion of what the law ought to be, rather than an attempt to predict what the Minnesota Supreme Court would decide. Further, its analysis of the policy considerations in this area appears to deviate from the orthodox analyses of the Minnesota Court. Its reliance on our decision in Lack Industries, Incorporated v. Ralston Purina Company, 327 F.2d 266 (8th Cir. 1964), for the general proposition that "the degree of fault warrants a narrower liability for nonintentional than for intentional misrepresentation" is misplaced. Lack Industries stands only for the proposition that statements concerning future action will not, in the absence of intentional deceit, support an action in fraud.

At least two of the Minnesota cases which have indicated that a particular contract limitation on damages or remedies is valid have done so only in the absence of allegations or proof of fraud. See, DeWitt v. Itasca-Mantrap Co-op Electrical Ass'n, *supra*; Marshall Milling Co. v. Hintz-Cameron Co., 156 Minn. 301, 194 Minn. 772 (1923). In the context of the Minnesota law of fraud, we believe it would be improper to read these cases as referring only to intentional fraudulent conduct.

## INTEREST

The rule in Minnesota is that a plaintiff is entitled to pre-judgment interest on a liquidated claim, a sum certain, or on an unliquidated claim if the claim is ascertainable by computation or reference to generally recognized standards such as market value, and if the claim does not depend on a contingency. Moosbrugger v. McGraw-Edison Company, 284 Minn. 143, 170 N.W.2d 72 (1969); Lacey v. Duluth, Missabe & Iron Range Ry. Co., 236 Minn. 301, 51 N.W.2d 831 (1952); Grand Forks Lumber Co. v. McClure Logging Co., 103 Minn. 471, 115 N.W. 406 (1908).

In the light of this standard, the trial court was clearly correct in awarding pre-judgment interest on the payments SM made to SBC for data processing services to Transport Leasing for rental of the Flexowriters, and to Friden for maintaining the Flexowriters. See, Brody v. Foster, 134 Minn. 91, 158 N.W. 824 (1916); Jones v. Burgess, 124 Minn. 265, 144 N.W. 954 (1914).

It is also the rule in Minnesota that pre-judgment interest is not allowed on unliquidated claims that are not readily ascertainable by computation or by reference to generally recognized standards, or where the amount of the claim is dependent in whole or in part upon the discretion of the jury. Employers Liability Assurance Corporation v. Morse, 261 Minn. 259, 111 N.W.2d 620 (1961); Swanson v. Andrus, 83 Minn. 505, 86 N.W. 465 (1901).

In the light of this criterion, we believe the trial court erred in assessing pre-judgment interest on the increased clerical costs and increased cost of supplies, and on the salaries paid to Droog and Butler, Jr. The amount of liability under each of these items was highly dependent upon the discretion of the trial judge. The process of determining damages for these items involved judgment and estimation, not mathematical calculations. The damages in these three categories, like those in Employers Liability Assurance Corporation v. Morse, *supra*, and Swanson v. Andrus, *supra*, depend upon many variables. Pre-judgment interest on these items, therefore, should not have been awarded.

## INVENTORY

There are at least two reasons why no recovery can be permitted on a fraud theory for the "obsolete inventory":

(1) The inventory was purchased long after the date which we have fixed as being the date beyond which there could be reliance by SM on representations made to it by SBC.

(2) The record is bare of any testimony directly relating the purchases of the obsolete inventory to misrepresentations made to SM by SBC. The testimony relied upon by the trial court to establish the alleged loss was that of Charles C. Butler. He testified only that $363,000 of inventory purchased in 1966 remained on the shelves in 1969, and that this inventory had a value, as of the date of trial, of $181,000.[17]

---

17. Charles C. Butler, a SM official, testified on direct examination as follows:
 "Q. * * * [Y]ou had a substantial increase in your dollar volume of inventory in the year 1966? A. That's right.

"Q. * * * [H]ave you made a determination currently as of today * * * as to how much of that inventory purchased in 1966 is still on your shelves? A. I have.
 " * * * A. $363,168.09.

No recovery for the "obsolete inventory" can be permitted on a breach of warranty theory, because the trial court expressly found that no express or implied warranties had been made by SBC and no cross-appeal is taken by SM on this finding.

Recovery on a breach of contract theory for the "obsolete inventory" is, as the trial court suggests in its opinion, a possibility, but we feel there is too little evidence in this record to justify a remand to the trial court for a determination as to whether SM can recover under such a theory. The sampling technique used to compute the value of the obsolete inventory as of December 31, 1966, is subject to serious question, and SM failed to establish that the "obsolete inventory" was larger on December 31, 1966, than it had been in any of the earlier years. The latter point is particularly important in the light of SM's contention that it purchased the data processing services because its inventory was out of control.

The appellant's final contention is that evidence as to damages is so speculative and the evidence as to benefits received so negligible that the trial court erred in granting any award. We cannot agree. The Supreme Court and this Court have stated on a number of occasions that, once the fact of damages has been established, the courts are allowed considerable leeway in arriving at the amount of damages. Eastman Kodak Co. of New York v. Southern Photo Materials Corp., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927); Arthur Murray, Inc. v. Reserve Plan, Inc., 406 F.2d 1138, 1146–1147 (8th Cir. 1969); Dean Foods Company v. Albrecht Dairy Company, 396 F.2d 652 (8th Cir. 1968).

We do not believe, except as hereinbefore pointed out, that the trial court abused its discretion in awarding damages. Contrary to the defendant's contention, the position of SM did not improve during the years that it justifiably relied on SBC's representations. Its average inventories increased from $1,823,000 in 1962 to $2,106,000 in 1965. The rate of turnover of inventory fluctuated, but it was worse in 1965 than it had been in 1962. Inventories as a percent of sales also increased.

SM's sales did increase during the period of reliance, from $6,918,000 in 1962 to $7,750,000 in 1965, but this increase only led to increased losses.

SM's losses were higher during the three years of reliance than they were in the three preceding years. While it can be argued that the largest loss occurred in 1963 before the contracts became effective, it can also be argued that at least a portion of the $445,000 loss in 1967 was attributable to SBC's misrepresentations.

We acknowledge that there is evidence in this record from which the trial court could have found that SM caused or sub-

---

* * * * *

"Q. * * * [H]ow do you characterize this inventory that was so purchased? A. * * * [M]erchandise that we bought in 1966 that is still on our shelves would be either obsolete or distressed merchandise.

"Q. * * * [W]hat has been your experience in your business as to your return or salvage of merchandise that you describe as being obsolete or distressed? * * * A. * * * [W]e have never received more than, or as much as, 50 cents on the dollar.

* * * * *

"Q. Does this inventory figure represent a loss to your company based upon purchases made in 1966? A. It does.

"Q. How much? A. $181,584.04.

* * * * *

"Q. Did you have an increase in inventory in '65 and '64? A. We did.

"Q. And did you have a loss in your business because of this increase? A. * * * [W]e did.

"Q. * * * But you haven't calculated other than the 1966 in this calculation? A. No, the only figures I have included in this total are the 1966 figures.

"Mr. Blethen: That is all. You may inquire."

stantially contributed to its own losses by poor management, inferior clerical personnel, absence of a uniform pricing policy for its merchandise, absence of a uniform discount policy, and by contracting for second and third generation reports before it was ready to use them; but the trial court found to the contrary, and we are not prepared to say it made a mistake in so doing.

The judgment of the lower court is affirmed in part and reversed in part. We remand to the District Court for recomputation of damages in accordance with this opinion.[18]

The parties are to bear the costs of their own briefs and are to share the costs of the appendix equally. All other costs in this Court are to be borne by the Appellant.

18. As an aid to the trial court on remand, we have attempted to estimate the amount of SM's award based on our opinion. In so doing, we followed the trial court's method of computing damages whenever it was consistent with our opinion. We also assumed that SM's total expenses in leasing and maintaining the Flexowriters were permanently fixed as of April 30, 1965. To the extent that this assumption is not accurate, the trial court should reduce the amount awarded for those items and for the corresponding interest.

### ESTIMATED AWARD PURSUANT TO OUR OPINION

(1) The sum paid by SM to SBC for data processing services from December, 1962, through April, 1965 .................................$ 89,000.00

(2) The expense incurred by SM in leasing the Flexowriters through April 30, 1965, plus the expense incurred in maintaining them, less their salvage value as of April 30, 1965 ($8,500.00) .........................................$ 98,198.00

(3) The increased cost of clerical personnel to SM in the years 1963 through April 30, 1965 ....................................$ 19,922.00

(4) The increased cost of office supplies to SM in the years 1963 through April 30, 1965 ....................................$ 29,086.00

(5) A portion of the salaries paid by SM to its executives for the supervision of the data processing system in the years 1963 through 1966 .......................$ 32,417.00

(6) Excess inventory purchased in 1966 and still on hand at the date of trial .........................$ .00

(7) Interest on Items (1) and (2) ............................$ 30,671.00

TOTAL ...................................$299,294.00

Less, Benefits Received by SM:

Original Contracts ......................$ 7,500.00
Second and Third Generation Reports .......................$ .00 *
Year-end Inventory Contracts ...........$10,000.00
Executive Salaries .....................$ 8,104.00
Counterclaims for Amounts Unpaid after 4–30–65 .................$23,014.83
Interest on Counterclaim Award ..,............................$ 2,930.00

TOTAL ...................................$ 51,548.83

NET RECOVERY ........................$247,745.17

* Assuming that no payments were made for these services prior to April 30, 1965.