# H. J. DeWITT v. ITASCA-MANTRAP COOPERATIVE ELECTRICAL ASSOCIATION.
## MARYLAND CASUALTY COMPANY, IMPLEADED DEFENDANT.[1]

July 9, 1943.

No. 33,505.

[1]Reported in 10 N. W. (2d) 715.

*DeLury & Peterson,* for appellant.

*Howard W. Anderson,* for respondent H. J. DeWitt.

*Abbott, MacPherran, Dancer & Montague,* for respondent Maryland Casualty Company.

THOMAS GALLAGHER, JUSTICE.

Plaintiff brought action against the Itasca-Mantrap Cooperative Electrical Association (hereinafter called the association) for a balance due him under a contract for the sale and delivery of poles for the latter's rural electric distribution system. The association answered, claiming that certain of the poles delivered did not comply with agreed specifications and interposed counterclaims for the cost of replacing them. Defendant Maryland Casualty Company, surety on plaintiff's performance bond (hereinafter called the surety), was impleaded as an additional defendant by the association.

The United States Rural Electrification Administration (hereinafter called REA) provided funds for the electric system, and its administrator had the right to supervise the performance of the contract and to inspect all materials furnished thereunder. He was required to approve invoices for materials before payment therefor by the association.

Plaintiff and the surety demurred to the answers and counterclaims of the association. The demurrers were sustained, and the association was granted leave to amend its answers and counterclaims subsequent to the determination of this appeal.

The complaint in substance alleged that between March 12, 1941, and December 5, 1941, plaintiff sold and delivered to the association,

under the terms of a written contract dated February 25, 1941, which was made a part of the complaint, certain poles described in the complaint, which were accepted by the association, removed from the agreed delivery point, and thereafter incorporated into its electric system, and upon which there was due and owing a balance of $2,342.90, plus interest.

The answers and counterclaims of the association in substance alleged the following defenses and counterclaims to plaintiff's action:

First, that plaintiff, knowing the purpose for which said poles were intended and the dimensions and specifications called for by the terms of the contract in connection therewith, nevertheless failed to deliver poles of the specifications required by said contract, and caused some of the poles which were delivered by him to be marked with brands which incorrectly indicated their length and class; that the association relied upon said brands and warranties, accepted delivery of the poles, and caused such improperly branded poles to be installed in its electric system; that in consequence it will be necessary for the association to replace the defective poles, to its damage in the sum of $19,513.73.

Second, that plaintiff caused certain brands to be placed on said poles, well knowing such brands to be false and fraudulent, with the intention of deceiving and inducing the association to accept delivery of said poles and to use them in its electric distribution system; that it relied upon such brands and believed them to be correct, and in consequence accepted delivery of said poles and incorporated them into its electric system, to its damage as alleged in the first defense.

Third, that plaintiff employed a pole inspector to examine said poles for compliance with dimensions and specifications set forth in the contract and directed said inspector to pass and approve poles which said inspector and plaintiff knew, or ought to have known, did not conform in length and class to the length and class indicated by the brands placed thereon; that plaintiff intended and

knew that the association would rely upon said inspection and would not make an independent inspection of said poles prior to their incorporation into the association's electric system; that the latter did rely upon said inspection, believing it to have been honestly and competently performed, whereas it was not, and that in consequence the association suffered damages as alleged in its first answer.

In connection with these defenses and counterclaims, the association in substance alleged that plaintiff, as principal, and the impleaded defendant, as surety, on March 13, 1941, had duly executed and delivered to the association a bond, which was made a part of said answers and counterclaims, conditioned that the association would be held harmless from costs and damages by reason of any failure on plaintiff's part fully to perform said contract; that said surety had been notified of the default of plaintiff and that demand had been made upon it for the sum of $17,399.60, the face amount of its bond, which sum the surety had failed and refused to pay.

The material portions of the contract are as follows:

"Inspection.

"All poles and anchor logs shall be inspected for full compliance with these Specifications, by a *pole inspector employed by the Owner* [the association] and satisfactory to the Administrator. The owner reserves the right to reject at the point of delivery such poles as do not conform to these Specifications, if such condition is demonstrated by examination and pole borings at said location or locations.

\* \* \* \* \*

"4. The prices of Materials set forth herein include the cost of delivery to Deer River, together with all sums which are or may be payable by the Bidder [plaintiff] or the Owner on account of taxes imposed by any taxing authority upon the sale, purchase or use of the Materials.

\* \* \* \* \*

"7. *All materials furnished hereunder shall be subject to the inspection, tests and approval of the Engineer or Inspector of the Owner* and the Administrator, and the Bidder shall furnish all information required concerning the nature or source of any Materials. All Materials furnished hereunder shall become the property of the Owner when delivered at the point where delivery is to be made; provided, however, that the Owner or the Administrator may reject any such Materials as do not comply with the Specifications for Materials, before incorporation of such Materials into the Owner's electric system. Upon any such rejection, the Bidder shall remove the rejected Materials and immediately replace them with materials complying with the Specifications for Materials.

\* \* \* \* \*

"14. The Bidder will frame all poles in accordance with drawing M20 of the standard REA specifications except class 7 and class 7X poles shall not be gained. All poles shall be branded with length and class in manner satisfactory to the owner's engineer.

"15. The Bidder shall furnish a pole *inspector satisfactory to the owner who shall work under the supervision of the owner's engineer. The owner shall have the right to terminate the inspector's services without cause* should the owner deem necessary for his best interest, whereupon the Bidder shall then be required to furnish a successor or successors as may be required." (Italics supplied.)

The material portions of the bond are as follows:

"1. Know all men that we, H. J. DeWitt, as Principal, and Maryland Casualty Company, as Surety, are held and firmly bound unto Itasca-Mantrap Cooperative Electrical Association (hereinafter called the 'Owner') and unto the United States of America (hereinafter called the 'Government') \* \* \* and to their successors and assigns, in the penal sum of Seventeen Thousand three hundred ninety-nine and 60-100 dollars ($17,399.60) as hereinafter set forth and for the payment of which sum well and truly to be

made we bind ourselves, our executors, administrators, successors and assigns jointly and severally by these presents. * * *

"2. The condition of this obligation is such that if the Principal shall well and truly perform and fulfill all the undertakings, covenants, terms, conditions and agreements of the Contract and any amendments thereto, * * * and shall well and truly reimburse the Owner and Government, as their respective interests may appear, for any excess in the cost of preparing and transporting of materials over the cost of such preparing and transporting of the materials as provided in the Contract and any amendments thereto, occasioned by any default of the Principal under the Contract and any amendments thereto, then this obligation shall be null and void, but otherwise shall remain in full force and effect.

"3. It is expressly agreed that this bond shall be deemed amended automatically and immediately, without formal and separate amendment hereto, upon any amendment to the contract, so as to bind the Principal and the Surety to the full and faithful performance of the Contract as so amended, provided only that the total amount of all increases shall not exceed 20 percent of the amount of the total price set forth in that part of the Contract entitled Proposal. The term 'amendment', wherever used in this bond, and whether referring to this bond, the Contract or the Loan Contract, shall include any alteration, addition, extension, modification, amendment, rescission, waiver, release or annulment, of any character whatsoever.

"4. It is expressly agreed that any amendment which may be made by agreement or otherwise between the Principal and the Owner in the terms, provisions, covenants and conditions of the Contract, or in the terms, provisions, covenants and conditions of the Loan Contract (including, without limitation, the granting by the Administrator to the Owner of any extension of time for the performance of the obligations of the Owner under the Loan Contract or the granting by the Administrator or the Owner to the Principal of any extension of time for the performance of the obligations of the Principal under the Contract, or the failure or re-

fusal of the Administrator or the Owner to take any action, proceeding or step to enforce any remedy or exercise any right under either the Contract or the Loan Contract, or the taking of any action, proceeding or step by the Administrator or the Owner, acting in good faith upon the belief that the same is permitted by the provisions of the Contract or the Loan Contract) shall not in any way release the Principal and the Surety, or either of them, or their respective executors, administrators, successors or assigns, from liability hereunder. The Surety hereby acknowledges receipt of notice of any amendment, indulgence or forebearance, made, granted or permitted."

It is the association's contention that paragraph 4 of the bond constituted an amendment to the original contract between plaintiff and the association and eliminated the necessity of requiring the latter to proceed under paragraph 7 of the contract for any breach thereof. Upon such defenses and counterclaims the association prayed for judgment against plaintiff for $19,513.73 and against the surety for $17,399.60, the face of its bond.

Plaintiff's demurrer was based upon the ground that the answers did not state facts sufficient to constitute a defense and that the counterclaims did not state a cause of action.

The demurrer of the impleaded surety was based on the ground that the answers did not state facts sufficient to constitute a defense to plaintiff's action and that the counterclaims were not proper under Minn. St. 1941, § 544.05 (Mason St. 1927, § 9254); that they did not state a cause of action against the surety; and that several causes of action were improperly united therein.

Plaintiff contends that the parties had agreed upon and provided an exclusive remedy in their contract, which required the association to inspect the poles at the point of delivery and to reject defective ones there, or, in any event, prior to their incorporation into the system, and that hence the defenses and counterclaims set up by the association were improper.

The trial court sustained plaintiff's demurrers, basing its order upon paragraph 7 of the contract, holding that that paragraph

provided the exclusive remedy of the association, and that thereunder it had the obligation of rejecting defective material before its incorporation into the electrical system.

The demurrer of the surety was sustained upon the ground that its surety bond was one for performance and its liability thereunder contingent upon liability first being established against plaintiff; that paragraph 7 of the contract governed the association's remedies, and that plaintiff, in executing said bond as principal, had not, in effect, amended or altered the original contract so as to waive his rights under said paragraph.

The association on this appeal claims error in the following: (1) That paragraph 7 of the contract does not exclude other remedies of the association for breach of contract; (2) that if said paragraph be construed as exclusive of other remedies, nevertheless plaintiff's conduct in incorrectly branding the logs constituted fraud on his part which induced the association to accept and incorporate into its system said defective poles, and that, accordingly, such conduct excused the association from rejecting the defective poles as required by paragraph 7; (3) that the surety bond, and in particular paragraph 4 thereof, constituted an amendment to the contract, whereby it was agreed that the association's failure to comply with the provisions of paragraph 7 of the contract did not bar it from resorting to other remedies for any breach thereof.

■ The association asserts that the remedy provided for in paragraph 7, while authorizing certain procedure in the event the contract was not properly performed, was not exclusive, and that under the contract it might resort to other remedies for breach thereof, notwithstanding that paragraph. In support of this contention, it asserts that the language of said paragraph is not mandatory, but provides merely that the owner *"may* reject any such Materials as do not comply with the Specifications * * * before incorporation of such Materials into the Owner's electric system." (Italics supplied.)

A careful consideration of the contract in its entirety leads us to the conclusion reached by the trial court, that is, that paragraph 7

provides the exclusive remedy of the association for delivery of defective materials. The reason for this is obvious. If such defects were ascertained and plaintiff notified thereof at the point of delivery, or prior to the incorporation of such material into the association's system, it would then be easy and economical for plaintiff to substitute new material for that rejected. In the case of Morris & Co. Inc. v. Power Mfg. Co. (6 Cir.) 17 F. (2d) 689, 690, a similar clause was thus construed. Therein, although the contract did not specify that the remedy there provided was exclusive, the court so construed it in the following language:

"The contract does not say in terms that, in the event the engine proved defective or incapable of doing the work, the plaintiff should have no other remedy than the right to require the seller to replace it or take it back and refund the purchase price. It does, however, specifically provide in that contingency for replacement by an engine that would meet the requirements or for a refund of such part of the purchase price as had been paid. It thus provides for the doing of certain things as the specific remedy available to the buyer and enforceable against the seller for a breach of the guaranty. This was agreed upon after thorough consideration of all the terms of the contract, and because of plaintiff's dissatisfaction with the original guaranty including the measure of liability. It seems clear to us that it was intended to be exclusive."

Here, by express agreement, the parties fixed the time in which the association was required to reject defective merchandise. It is admitted by the pleadings that it did not avail itself of the remedy provided within the time permitted; and hence, unless some fraudulent act of the plaintiff induced the association to waive its rights thereunder, it is clear that such paragraph bars it from asserting damages herein or pursuing other remedies for breach of the contract.

It is true that what constitutes a reasonable time for rejection of defective merchandise in cases of this kind is, under Minn. St. 1941, § 512.49 (Mason St. 1927, § 8423), usually a fact question.

However, here the language is definite that rejections were to be made before installation of the material, and hence there is no question of fact with reference to the time permitted. As stated in Laundry Service Co. v. Fidelity Laundry M. & E. Co. Inc. 187 Minn. 180, 184, 245 N. W. 36, 38:

"Whether the purchaser exercises his right to rescind within a reasonable time is usually a question of fact for the jury. * * * But conditions may exist that make the question one of law. * * * We think it was one of law in this case. Had the case gone to the jury and a verdict been returned for plaintiff, it would have been the duty of the trial court to set it aside."

These factors make it clear that, insofar as the pleadings are concerned, no proper defense or basis for counterclaim was alleged by the association, and unless the question of fraud intervenes the trial court was correct in sustaining the demurrers.

■ The association's first defense and counterclaim is based upon the contention that plaintiff breached an implied warranty of fitness for purpose in connection with the poles which were sold and delivered contrary to specifications. The implied warranty of fitness for purpose is covered by Minn. St. 1941, § 512.15(1), (Mason St. 1927, § 8390), which provides:

"Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and *it appears that the buyer relies on the seller's skill or judgment* (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose." (Italics supplied.)

The contract clearly evidences the fact that the association did not at any time rely upon plaintiff's skill or judgment in connection with the material sold thereunder. On the contrary, it and the administrator of the REA relied solely on their own judgment and experience. The association and, presumably, the REA, with whom it worked in close coöperation, prepared the contract. The dimensions of poles required were carefully specified therein, and

numerous provisions were inserted relative to inspection and testing of the merchandise and providing for rejection of that deemed deficient. The language of the contract makes it obvious that plaintiff had no knowledge of the business in question, and that the association was in no way trusting to his skill or judgment. Under such circumstances, there was no implied warranty of fitness for purpose on the part of plaintiff. Central Warehouse Lbr. Co. v. Redlinger & Hansen Co. 193 Minn. 42, 257 N. W. 656.

■ The trial court in its order sustaining the demurrers provided that the association should have 20 days after the final determination of the matter by this court in which to amend its answers and counterclaims. The court's memorandum indicated that such relief was predicated upon the belief that, under proper pleadings, the association might show that its failure to reject material within the time specified in the contract was excusable, or, in other words, that its omission in this respect may have been occasioned by some misconduct or fraud on the part of plaintiff. The answers and counterclaims as presently constituted are manifestly insufficient insofar as the claims of fraud or collusion are concerned and impel us to affirm the trial court's order sustaining the demurrers thereto on this point.

The contract provides that the association should make the necessary inspections and rejections of defective material before incorporation thereof into its electric system. While it is true that plaintiff was obligated to brand the poles under the contract, he could do this only under the direction of the association's inspector, who had equal opportunity with him to measure and otherwise classify such poles. The claim of fraud is that some of the poles did not have the circumference which the brands thereon indicated. The defects claimed accordingly were not latent, but readily ascertainable upon inspection. The contract does not provide that such branding was to constitute the final determination of the parties as to specifications, etc. On the contrary, it requires that an inspector employed by the association should make an inspection at the point of delivery and, presumably, subsequent to or simultane-

ously with the process of branding. It further provides that after such inspection the association might reject any poles found defective by the inspector.

Under such circumstances it is difficult to see how plaintiff's actions in branding the poles can be urged by the association as in any respect excusing its failure to reject the poles before incorporating them into its system, particularly if it should appear that the association, in compliance with the contract, furnished the inspector, and relied upon him rather than upon the plaintiff, with reference to the specifications. The case would appear to be governed by Meland v. Youngberg, 124 Minn. 446, 451, 455, 145 N. W. 167, 169, Ann. Cas. 1915B, 775, which provides:

"To establish a claim for damages based upon the making of false representations, plaintiff must show that he relied upon such representations to his injury. Although one party may make representations which are untrue, yet, if the other party, instead of relying thereon, makes an independent investigation of his own, either in person or through his agents, and acts upon the result of such investigation without regard to the representations made by the adverse party, the rule is well-nigh universal that such representations do not give rise to a cause of action.

\* \* \* \* \*

"In the case at bar, plaintiff undertook to investigate and determine for himself whether he would accept the engine. \* \* \* He sent Hanson to make the examination, and authorized him to accept the engine, if found to be satisfactory. \* \* \* The nature and extent of his investigation does not appear. \* \* \* No claim is made that it was not as full and complete as he desired, nor that defendant interfered with or restricted his investigations in any manner."

See also 27 Minn. L. Rev. 117, 154.

The second and third answers and counterclaims, whereby the association seeks to establish fraud and collusion on the part of plaintiff excusing its failure to reject the poles before their incorporation into its electric system are in general terms and fall short

of the specific allegations required by well established rules governing such cases. As stated in Malsby & Avery v. Young, 104 Ga. 205, 30 S. E. 854:

"Where under a contract of purchase the vendees are allowed a specified time in which to discover defects, and they by contract bind themselves to report immediately thereafter to the sellers all defects so discovered, it is not * * * proper for the court * * * to treat the contract as allowing the vendees an indefinite period in which to discover and complain of such defects, there being evidence to show that they had full opportunity to do so within the time limited, and also to warrant a finding that they had waived the defects they sought to prove at the trial. The above is true though the vendees in such pleadings, in general terms, alleged that the sellers had perpetrated a fraud upon them by falsely representing the qualities of the property sold."

See Rogers v. Drewry, 196 Minn. 16, 264 N. W. 225; Hutchins v. Bassin, 170 Minn. 126, 212 N. W. 202; Schreiner v. Ranweiler, 169 Minn. 92, 210 N. W. 628; Johnson Service Co. v. Kruse, 121 Minn. 28, 140 N. W. 118.

While the foregoing circumstances cast doubt upon the association's ability to establish fraud, it is possible that some of the facts relative thereto may be in dispute, and accordingly the parties should have the right, under proper pleadings, to present evidence in support of their contentions. No doubt it was with this thought in mind that the trial court granted the association additional time in which to amend its pleadings.

■ The association asserts that paragraph 4 of the bond constitutes, in effect, an amendment or alteration of the contract, and that plaintiff thereby waived rights granted him under paragraph 7 of the contract; hence that he is estopped from urging, as a defense to the association's counterclaims, the latter's failure to proceed under paragraph 7. Under the association's theory, the contract and bond are to be considered together in determining the rights of the parties.

The association relies upon paragraph 4 of the bond in support of this argument. This paragraph is not free from ambiguities. The language therein relied upon by the association is as follows:

"It is expressly agreed that any amendment which may be made by agreement or otherwise between the Principal and the Owner in the terms, provisions, covenants and conditions of the Contract * * * (incluiding, without limitation, * * * the failure or refusal of the Administrator or the Owner to take any action, proceeding or step to enforce any remedy or exercise any right under * * * the Contract * * * or the taking of any action, proceeding or step by the Administrator or the Owner, acting in good faith, upon the belief that the same is permitted by the provisions of the Contract * * *) shall not in any way release the Principal and the Surety * * * from liability hereunder."

The association contends that this language bars plaintiff and his surety from asserting any rights under paragraph 7 of the contract. We do not agree with this construction. To hold in accordance with the association's claim would mean that plaintiff, in executing the bond simultaneously with or shortly after the execution of the contract, had thereby in advance eliminated all protection accorded him under said paragraph 7. We believe that what the parties intended by the above language was that if plaintiff and the association, *by specific agreement,* amended the contract, or if plaintiff, *by his conduct,* led the association to believe that he had waived his rights under paragraph 7 thereof, nevertheless the surety would still be liable under the bond. It is undisputed here, however, that plaintiff did not, by agreement or by conduct, waive any protection afforded him by the contract. It must follow that, since there has been no amendment or change in the terms of the original agreement insofar as plaintiff is concerned, the surety's liability on the bond is still measured by plaintiff's rights and obligations under the contract as originally executed. Fort Worth Ind. School Dist. v. Aetna C. & S. Co. (5 Cir.) 48 F. (2d) 1, 77 A. L. R. 222.

The order of the trial court is affirmed and the case remanded for further proceedings as provided in said order.

MR. JUSTICE MAGNEY, not having been a member of the court when this case was argued and submitted, took no part in its consideration or decision.

[1]Reported in 10 N. W. (2d) 734.