WALTER SASS, Plaintiff-Appellee, *v.* JON T. SPRADLIN *et al.*, Defendants-Appellants.
Second District   No. 77-420

Opinion filed December 19, 1978.

Mohr and Parks, of McHenry, for appellants.

Pollock, Meyers, Eicksteadt & Arnold, Ltd., of Marengo, for appellee.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

The defendants appeal from a judgment against them in the amount of $3558.94 arising out of the sale of a dump truck.

The defendant, Jon T. Spradlin, Jr., is the son of John Spradlin, who operates a construction firm. Ruth Spradlin, also a defendant here, is John Spradlin's wife and Jon Spradlin's mother. She acts as bookkeeper and typist for the construction business.

From the testimony at trial it appears that Walter Sass, the plaintiff, answered an advertisement which had been placed by Jon T. Spradlin offering a dump truck for sale. Walter Sass first drove the truck on about June 17, 1976. The asking price for the truck was $12,000. On June 22, Walter Sass returned with his brother to look at the truck again. He offered $10,000 for it; however, he did not drive the truck on that day because the Spradlins informed him of some difficulty with the transmission of the truck since he had test-driven it the week before. They said they had taken the transmission out of the truck to repair it and it would be a couple of days before the repairs could be completed. Jon T. Spradlin testified that at one time during these preliminary conversations Walter Sass told him the truck was going to be used for farm work which he supposed meant "grain" and also for "gravel." There was apparently no other reference to the proposed use of the truck.

The testimony is not entirely clear as to whether Sass actually bought and paid for the truck on that day or on the next day, June 23, 1976.

After the conversation relative to the transmission—which was with the defendant's father—Walter Sass gave Jon Spradlin, or his mother, Ruth, the sum of $10,000 and asked for a bill of sale. At that time the transmission was still out of the truck. Ruth Spradlin testified that she had no form for a bill of sale but she looked through some sample forms she found in a typing exercise book and located one entitled "Bill of Sale." She copied the form, including the phrase at the bottom, "in undamaged condition" and she and her son, Jon, who were part owners of the truck, signed it. Walter Sass and his brother looked it over and Walter also signed it.

Walter then apparently returned home and two or three days later came back, at which time he was told the transmission was repaired. He took the truck and drove it to his father's farm, about six miles away. He did not drive the truck for about three weeks after that, since he had not arranged for insurance coverage. Whether the truck was used before July 22 is not clear from the testimony. However, on July 22, the Sasses used the truck to haul gravel. Walter Sass testified that on the fifth or sixth load he hauled, he noticed the transmission of the truck was slipping. He called the Spradlins who came over and Mr. Spradlin, Sr., suggested that they change the oil and oil filter on the transmission as he had once had some trouble with the transmission which had been taken care of by doing this. Accordingly, Sass changed the transmission oil and filter. This did not cure the problem. Sass then employed a friend of his who was a mechanic to assist him and his brother in tearing the transmission down to inspect it and to determine what the trouble was. According to the testimony of this mechanic, after the transmission was torn down, it was discovered that it had been assembled incorrectly; that there was a misalignment of certain parts and that this had caused serious damage to the transmission which was not due to normal wear and tear.

The Sasses apparently informed the Spradlins of their findings and asked the Spradlins if they would pay for half of the cost of repairing the transmission. Jon Spradlin testified that he suggested the transmission be taken to Western Engine Company to get its opinion. This apparently was done but there is no testimony as to what was actually done with the transmission at Western Engine Company. Jon Spradlin testified he did not take the transmission to Western Engine himself as he was in the hospital at that time. Presumably nothing was done with the transmission at Western Engine, possibly because, as testified to by Jon Spradlin, the Spradlins would not accept the obligation to pay half of the repairs before they knew the opinion of Western Engine. Jon Spradlin testified that while he was laid up in the hospital, sometime after the transmission had been taken to Western Engine, Walter Sass visited him in the hospital to

find out what news he had from Western Engine. In the course of that conversation, Jon testified, Walter Sass told him that he had gotten the truck stuck in some soft ground at a gravel pit, just before the trouble with the transmission developed. This was apparently an attempt to establish that the unusual condition of the transmission was due to the strain put on it by trying to get out of the soft ground.

The upshot of the matter was that Walter Sass decided to replace the transmission with an exchange transmission which he bought and with his brother installed in the truck at a cost of approximately $1950. Walter Sass testified that prior to purchasing the truck he had secured a contract to haul gravel for Nick Petropoulos and had arranged to lease the truck in question for that purpose. He testified that he had lost approximately $2200 in expected earnings from this contract because of the truck being out of operation from July 23 until the transmission was replaced. The bill for the exchange transmission is dated August 26. Petropoulos's testimony, from his records of Walter Sass's earnings in other months, supported a figure of approximately $1600 in lost earnings during the time the truck was down for repairs, which amount, together with the cost of the exchange transmission, amounted to $3550, approximately the amount of the judgment.

The complaint in this case is based on a theory of express warranty using the words of the bill of sale "undamaged condition" as such and on the implied warranty from the fact that Jon Spradlin knew that Walter Sass intended to use the truck to haul gravel, thereby impliedly warranting that it was fit for such purpose. In this appeal the defendants contend the words referred to as constituting a warranty and the circumstances of the sale negate any warranty, express or implied, in the transaction. Ruth Spradlin testified that she typed the words "used, undamaged condition" at the end of the description of the truck merely because the typing sample she copied the bill of sale from contained these words. The plaintiff did not contend there was any dealing or dickering about a warranty or any conversation prior to the issuance of the bill of sale regarding a warranty. Ruth Spradlin testified she was not asked to include any words of warranty in the bill of sale and that the words "undamaged condition" were part of the form she copied and to her merely meant that the truck had not been damaged in an automobile accident.

The defendants argue that under section 2—313(1)(a) of the Uniform Commercial Code (Ill. Rev. Stat. 1975, ch. 26, par. 2—313(1)(a)), the "express warranties" section of the Code, the "affirmation of fact or promise made by the seller to the buyer" constituting an express warranty is one "which relates to the goods and becomes part of the basis of the

bargain." This, as pointed out by the defendants, was explained in *Alan Wood Steel Co. v. Capital Equipment Enterprises, Inc.* (1976), 39 Ill. App. 3d 48, as referring to " 'dickered' terms of the individual bargain." (39 Ill. App. 3d 48, 53.) In this case the defendants argue that there was no bargaining or dickering relative to a warranty and the words "undamaged condition" were gratuitiously inserted in the bill of sale after the bargain had been struck and the money paid, thus negating the intention by the defendants to include a warranty as part of the sale. The defendants also contend that the circumstances do not give rise to an implied warranty because the plaintiff well knew that the defendants had no special knowledge or skill with relation to the repair or condition of a dump truck; that they were simply private parties—neither dealers nor mechanics—and since any truck is assumed to be able to go forward and backward, the transmission had no special relation to the function of hauling gravel; therefore, there was no implied warranty of a special fitness for that purpose. Defendants further argument was that any warranty would have been about the truck's condition generally and was not an implied warranty as to fitness for a particular use.

Section 2—315 of the Uniform Commercial Code, dealing with implied warranties for a particular purpose reads as follows:

> "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose." Ill. Rev. Stat. 1975, ch. 26, par. 2—315.

■■ Obviously, this language does not fit the circumstances of the case before us and we do not consider an implied warranty to be in effect under the state of facts existing here. Jon Spradlin was the employee of a cement manufacturing concern. His mother, part owner of the truck with him, was a housewife and bookkeeper. Spradlin, Sr.'s business was that of construction. None of the three could assume to have, or so far as the record indicates, professed to have had, any particular skill or knowledge which the buyer was justified in relying on. Thus, there remains only to consider the defendants' contention that the words of the bill of sale do not constitute an express warranty because the circumstances do not indicate such words were part of the bargain made between the parties, that is, that it was a dickered term of the contract, therefore, the words in question did not constitute an express warranty, since such was not the understanding between the parties.

As indicated in the statute defining an express warranty (section 2—313(2) of the Uniform Commercial Code):

"It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." Ill. Rev. Stat. 1975, ch. 26, par. 2—313(2).

The mechanic who was allowed to testify as an expert testified to the effect that the transmission had been improperly repaired and reassembled, resulting in damage not attributable to ordinary wear and tear. This opinion was not contradicted by any other expert testimony. The trial court found that this fundamental fault amounted to a violation of the warranty that the truck was in "undamaged condition" when the bill of sale so stating was given to the plaintiff.

■■ The defendants cite the case of *Janssen v. Hook* (1971), 1 Ill. App. 3d 318, where it was held that the statement of the seller to the buyer that the truck was "in good condition" was not an express warranty. That case is readily distinguishable, however, from the one before us because in the *Janssen* case the buyer himself was aware that the truck in question was in poor condition when he bought and he could not, therefore, have relied on the seller's representation to the contrary in buying the truck. In the case we deal with here there is ample reason to believe that the buyer did rely on the sellers' representation to the effect that the truck's transmission had been repaired so as to place it in good operating condition. While the phrase "undamaged condition" is somewhat ambiguous it is hardly debatable that a truck whose transmission has been disassembled and then reassembled in a defective manner so that it is bound to break down has been thereby damaged and is not in an "undamaged condition."

We disregard the defendants' argument that section 2L of the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1975, ch. 121½, par. 262L) limits their liability as therein set forth, since that statute in no way relates to cases of express warranty, but automatically imposes on *dealers only* a limited liability without regard to either express or implied warranty. The defendants were not automobile dealers and we therefore find section 2L to be irrelevant and no deductions in the defendants' favor can be made from that statute.

The judgment of the circuit court of McHenry County is therefore affirmed.

Judgment affirmed.

NASH and WOODWARD, JJ., concur.