**PIONEER PEAT, INC., Respondent,**

v.

**QUALITY GRASSING & SERVICES, INC., Defendant,**

and

**Pioneer Peat, Inc., Respondent,**

v.

**Richard Colyer, et al., Appellants.**

No. C0–02–413.

Court of Appeals of Minnesota.

Nov. 26, 2002.

470 

Rex A. Hammarback, Hammarback Law Office, East Grand Forks, MN, for respondent.

Patrick R. Morley, Kraig A. Wilson, Morley Law Firm, Ltd., Grand Forks, ND, for appellants.

Considered and decided by LANSING, Presiding Judge, RANDALL, Judge, and WILLIS, Judge.

## OPINION

LANSING, Judge.

This appeal involves a dispute between a peat-moss supplier and a company that blends topsoils for golf-course greens. The district court found that the contract for a shipment of peat did not create a warranty by sample, the buyer did not reject the peat in a timely manner, the supplier was denied a reasonable opportunity to cure, and the ambiguity in the attorneys' fees provision should be construed against the supplier. The record supports the district court's findings of fact which, in turn, support its legal conclusions, and we affirm.

## FACTS

Pioneer Peat, Inc. produces and sells peat moss, which is used to construct golf-course greens. Pioneer Peat markets the name of the peat it sells as Dakota Reed Sedge Peat (Dakota Peat). Richard Colyer owns Golf Agronomics, a company that blends topsoils for golf-course greens. Golf Agronomics purchases peat moss to blend with sand to obtain a "root-zone mix" that is placed on golf-course greens to ensure proper and consistent drainage on the greens.

Colyer contacted Jerry Schmitz at Pioneer Peat in February 1999 to purchase Dakota Peat moss to use on a golf course where the project engineer's specifications required Dakota Peat. During this conversation, Colyer advised Schmitz that he needed to receive a shipment of peat "early" so that the peat could be calibrated with sand to determine the proper root-zone mix for the project. Because he did not have enough storage space for an entire peat shipment, Colyer did not initially order all of the peat he needed.

Golf Agronomics received the first shipment of Dakota Peat in March 1999. Samples were taken from the shipment and mixed with sand in a blending machine to create an appropriate root-zone mix. In June 1999, Golf Agronomics ordered another shipment of Dakota Peat. Raw samples of peat were taken from this shipment too and blended with the same sand, in an attempt to create the proper root-zone mix, based on the calibration of the previous shipment. Test results showed that the fiber content in the peat changed from the first shipment to the second, and that the change affected the root-zone mix. On July 26, 1999, Colyer informed Schmitz that the project architect rejected the second shipment of Dakota Peat. About the same time, Colyer substituted Canadian sphagnum peat for the project. After July 26, Pioneer Peat did not offer to replace the second shipment of Dakota Peat, and Golf Agronomics refused to pay for that shipment.

Pioneer Peat sued Golf Agronomics and Colyer in November 1999 to collect payment for the second shipment. Golf Agronomics denied responsibility for payment, contending that Pioneer Peat breached an express warranty by sample, an implied warranty of merchantability, an implied warranty of fitness for a particular purpose, and failed to provide peat that complied with United States Golf Association (USGA) specifications.

Following trial, the district court found that no implied, express, or sample warranties had been created under the contract, that Dakota Peat met USGA specifications, that Golf Agronomics failed to reject the peat in a timely manner, and that Golf Agronomics did not give Pioneer Peat an opportunity to cure. The court ordered payment for the second shipment and payment of $500 in attorneys' fees. Golf Agronomics appeals the district court's conclusions on the warranty by sample, untimely rejection, and opportunity to cure. Pioneer Peat challenges the amount of attorneys' fees.

## ISSUES

I. Did Pioneer Peat create an express warranty by sample?

II. Did Golf Agronomics notify Pioneer Peat in a timely manner of its intention to reject the second peat shipment?

III. Did Golf Agronomics provide Pioneer Peat an opportunity to cure?

IV. Did the district court err in interpreting the contract provision on attorneys' fees?

## ANALYSIS

 This court will not set aside a district court's findings of fact unless they are clearly erroneous. Minn. R. Civ. P. 52.01. Clearly erroneous means "manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *N. States Power Co. v. Lyon Food Prods., Inc.*, 304 Minn. 196, 201, 229 N.W.2d 521, 524 (1975). On established facts, whether a warranty is created is an issue of law. *Dworsky v. Vermes Credit Jewelry, Inc.*, 244 Minn. 62, 66, 69 N.W.2d 118, 122 (1955).

**I**

 Colyer and Golf Agronomics (collectively referred to as Golf Agronomics) argue that the district court erred in concluding that the first shipment of Dakota Peat did not create a warranty by sample for the second Dakota Peat shipment. Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model. Minn.Stat. § 336.2–313(1)(c) (1998). Express warranties rest on "dickered" aspects of the individual bargain. Minn.Stat. Ann. § 336.2-313 U.C.C. cmt. at 1 (2002). To constitute a sale by sample, it must appear that the parties contracted solely in reference to the sample or article exhibited, and that both mutually understood they were dealing with the sample with an understanding that the bulk was like it. *Day v. Raguet*, 14 Minn. 273, 282, 14 Gil. 203, 210 (1869). In determining whether a sample is intended to become a basis of the bargain, the analysis centers on "whether the seller has so acted with reference to the sample as to make him responsible that the whole shall have at least the values shown by it." Minn.Stat. § 336.2–313 cmt. 6.

No evidence in the record establishes that Pioneer Peat and Golf Agronomics contracted solely in reference to a sample, that they mutually understood they were dealing with a sample, or that the composition of the first shipment formed a basis for the bargain. In other words, the parties did not "dicker" about whether the first peat shipment constituted a sample. *Cf. Sass v. Spradlin*, 66 Ill.App.3d 976, 23 Ill.Dec. 670, 384 N.E.2d 464, 467 (1978) (stating express warranties are created when parties dicker over the terms of a contract); *see also Bowen v. Young*, 507 S.W.2d 600, 605 (Tex.App.1974) (stating express warranties rest on dickered aspects of the individual bargain and clearly

go to the essence of the bargain). In addition, the record supports the district court's finding that Pioneer Peat's sole representation concerning the sample was that the peat would have an organic content of at least 85%, the required USGA standard. It is undisputed that both shipments of Dakota Peat met this requirement.

## II

■ Alternatively, Golf Agronomics argues that the second shipment of Dakota Peat was nonconforming and was rejected in a timely manner. Rejection of goods must occur within a reasonable time after delivery or tender. Minn.Stat. § 336.2–602(1) (1998). Rejection is ineffective unless the buyer seasonably notifies the seller. *Id.* An action is taken seasonably when it is taken within a reasonable time. Minn.Stat. § 336.1–204(3) (1998). Absent a contract provision defining the time allowed for rejection, a reasonable time for rejection is a question of fact. *DeWitt v. Itasca–Mantrap Co-op. Elec. Ass'n,* 215 Minn. 551, 559, 10 N.W.2d 715, 719 (1943).

Golf Agronomics rejected the second shipment approximately one month after it was received. Golf Agronomics claims it notified Pioneer Peat of the rejection as soon as the project architect told the company that he would not accept the Dakota Peat. But Golf Agronomics was blending a substitute peat for the remainder of the project at the same time it rejected the second shipment of Dakota Peat. The district court could reasonably infer that Golf Agronomics knew the Dakota Peat was unsuitable and had ordered the substitute goods well before they notified Pioneer Peat of the rejection. The district court's finding that rejection did not occur within a reasonable time is not clearly erroneous.

## III

■ Golf Agronomics further argues that because Pioneer Peat made no attempt to cure the defects of the second shipment of peat after the July 26 rejection, the district court erred in finding that Pioneer Peat was not given an opportunity to cure. When a buyer rejects a nonconforming tender, which the seller had reasonable grounds to believe would be acceptable with or without money allowance, the seller may, on seasonably notifying the buyer, have a further reasonable time to substitute a conforming tender. Minn. Stat. § 336.2–508(2) (1998). An action is taken seasonably when it is taken within a reasonable time. Minn.Stat. § 336.1–204(3).

Golf Agronomics was already blending a substitute peat when it rejected the Dakota Peat. This precluded Pioneer Peat from having a reasonable opportunity to cure. *Cf. Durfee v. Rod Baxter Imports, Inc.,* 262 N.W.2d 349, 355 (Minn.1977) (finding that when a dealership had a reasonable opportunity to cure a defective automobile, further attempts to cure were unseasonable). Consequently, the district court did not err in concluding that Pioneer Peat was denied a reasonable opportunity to cure.

## IV

■ Pioneer Peat challenges the district court's conclusion that the contract provision imposing attorneys' fees is ambiguous and that the ambiguity should be resolved against Pioneer Peat as the drafter. A writing is ambiguous if, judged by its language alone and without resort to extrinsic evidence, it is reasonably susceptible of more than one meaning. *Metro Office Parks Co. v. Control Data Corp.,* 295 Minn. 348, 351, 205 N.W.2d 121, 123 (1973). The determination of whether an ambiguity exists is a question of law. *Tur-*

*ner v. Alpha Phi Sorority House,* 276 N.W.2d 63, 66 (Minn.1979). Courts are required to give the words of an instrument their plain and ordinary meaning during construction. *Id.* at 67. And any ambiguity in the language of a contract will be resolved against the party who drafted the language. *Cherne Indus., Inc. v. Grounds & Assocs.,* Inc., 278 N.W.2d 81, 89 (Minn.1979).

The contract provides for attorneys' fees if Pioneer Peat must hire an attorney to collect payments due under the contract:

> In the event it becomes necessary for our firm to employ an attorney or collection company to collect this amount, you will pay any/all attorney fees and collection agency fees in the amount of 25% or $500.00, whichever is applicable, including court costs and interest at the rate of 2% PER MONTH (24% ANNUALLY) on amounts due and payable.

The district court found the contract ambiguous as to whether the buyer is obligated to pay all attorneys' fees, 25% of the attorneys' fees, or $500. The court construed the contract provision against Pioneer Peat and awarded $500 in attorneys' fees. We conclude that the district court did not err in its determination of ambiguity, and we affirm.

## DECISION

The district court did not err in concluding that Pioneer Peat did not create a warranty by sample, that Golf Agronomics failed to reject the second shipment of Dakota Peat in a timely manner, and that Golf Agronomics did not give Pioneer Peat a reasonable opportunity to cure. Finally, because the court reasonably concluded that the contract language on attorneys' fees was ambiguous, we affirm the award of attorneys' fees.

**Affirmed.**